NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0367n.06

No. 18-4147

| | | |
|---|---|---|
| UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT | | **FILED**<br>Jul 17, 2019<br>DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| MARTHA BUENDIA-CHAVARRIA, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

SUHRHEINRICH, Circuit Judge. Defendant-Appellant Martha Buendia-Chavarria ("Defendant") pleaded guilty to various identity theft charges. On appeal she challenges the procedural and substantive reasonableness of her sentence. We find that her sentencing issues have no merit, and therefore **AFFIRM** the judgment of the district court.

**I.**

While investigating Manuel Granados for trafficking in false identification documents, law enforcement agents learned that he had purchased approximately fifty-two false identification documents—such as state identification cards, social security cards, and lawfully admitted permanent resident cards—for his customers from "TM," short for Tonya Marshall. But Granados was not dealing with the real TM, a United States citizen from Puerto Rico. Rather, Granados was conducting business with Defendant, a Mexican citizen in the United States illegally, masquerading as TM.

The agents obtained a search warrant for Defendant's residence, which proved fruitful. They discovered thirteen false identification documents in Defendant's name or bearing her photograph with TM's name; five handwritten ledgers containing personal identification of other individuals; used printer ribbons containing evidence of previously manufactured false identification documents; and numerous document-manufacturing devices, including nine laptop or tablet computers, eighteen cellular phones, four USB drives, three cameras, and five printers. Forensic analysis of the printers and devices seized during the search indicated that Defendant produced between 1,000 and 1,100 false identification documents. The presentence report states that Defendant had received at least 118 wire transfers from individuals in Mexico and the United States, totaling approximately $45,000.

Defendant pleaded guilty without a plea agreement to possession with intent to transfer unlawfully five or more identification documents, in violation of 18 U.S.C. § 1028(a)(3) (Count 1); possession of document-making implements and authentication features, in violation of 18 U.S.C. § 1028(a)(5) (Count 2); making a false statement or claim of citizenship with intent to obtain a state or federal benefit, in violation of 18 U.S.C. § 1015(e) (Count 3); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). The advisory Guidelines range for Counts 1 to 3 was 24 to 30 months, with a mandatory consecutive 24-month sentence on Count 4.

At sentencing, defense counsel requested a downward variance to one day of incarceration for Counts 1 to 3, based on Defendant's personal and family circumstances, attempts to cooperate, and fear of retaliation after her efforts were made public. Defense counsel pointed out that, had this been a drug crime, Defendant would have been entitled to a reduction under the safety valve. Counsel noted that Defendant supported her two children, and that she had a pending application for asylum. Finally, defense counsel explained that Defendant feared retaliation upon return to

Mexico because her name was mentioned in several news stories about a raid by Immigration and Customs Enforcement ("ICE") at Corso's, a local gardening company, because many of the individuals arrested had obtained false identification documents from Defendant. During allocution, Defendant apologized for her crimes. She said that she was forced into this criminal enterprise by an abusive husband, but acknowledged that she had made bad decisions.

In response the government argued that the proper focus was not on the trauma of Defendant's early life but on the number of false identification documents Defendant produced for others. The government pointed out that Defendant's commentary about her estranged husband was inconsistent with statements in her asylum application. The government also asked the court to consider the impact on Tonya Marshall, who described the trauma she experienced. The government highlighted "the full extent" of Defendant's crimes, which involved "holograph overlays . . . gold and silver ink . . . [and] blank PVC cards that when completed will become real identities that people can use to get a job or disappear or do anything." The government asked for a 54-month sentence, which represented the higher end of the Guidelines on Counts 1 to 3, plus the mandatory 24-month sentence on Count 4. Last, the government stated that if this were a drug case, Defendant would not be entitled to a safety valve, because she was "not a drug mule . . . she was the producer. She produced these false documents."

At this point the court entertained argument on one issue, and then sealed this portion of the transcript. The government disputed the claim that Defendant's cooperation precipitated the raid at Corso's, pointing out that Defendant's name was mentioned only twice in the warrants, which remained under seal. Her name came up because many of the individuals arrested at the gardening company had obtained false identification documents from Defendant. The government stated that Defendant's proffered information was difficult to corroborate. The government

pointed out that it had offered to move for a four-level downward departure after Defendant's name was mentioned in the newspaper articles about the raids. Defendant rejected these offers and pled guilty without a plea agreement. Defense counsel responded that an ICE spokesperson had mentioned Defendant by name, and that Defendant had rejected the government's offer because she had not been treated fairly. The government disputed that an ICE spokesperson had publicized Defendant's name.

The district court then reviewed the § 3553(a) factors. See 18 U.S.C. § 3553(a). The court stated that it was "required to make an individualized assessment based on the facts of [Defendant's] case to arrive at an appropriate sentence." The court concluded that Defendant was "operating . . . a false document mill," and was "an imposter and forger." The district court felt that Defendant was portraying herself as a victim rather than a criminal. The court addressed her claim that she was in danger because the media had publicized her alleged cooperation:

> Let me talk for a moment about the media coverage since that's been brought up again here today, and what the media coverage of the Corso's raid had to do with you. I can't control what the media says. There are times I certainly wish I could, but we're in America and we have freedom of the press; and to a large degree, that is what it is. But I believe the government today has made some points about the timing of all of this. And whether people want to speculate about what role you may have had in that, they can. I don't find that as something that is serious enough, if you will, that would diminish the crime in this case.

The court granted Defendant a two-point reduction for accepting responsibility (as well as an additional one-point reduction for assisting authorities), based on her statement to the probation officer that "had [she] known before that [she] was committing this crime, [she] would have thought a lot before accepting another identity." Still, the Court commented that it had "no doubt" that Defendant understood that she was committing a crime.

Next, the court reviewed Defendant's personal history and characteristics, including her lack of a criminal record, the effect of conviction on her children, her difficult childhood and

abusive husband. However, these factors did not outweigh Defendant's active role in the criminal activity from November 2009 through October 2017.

The district court explicitly rejected each of Defendant's arguments for a downward variance. First, the court refused to consider the sentences imposed in related cases. Second, the court found that Defendant's family circumstances did not warrant a downward variance, since she had been in the United States for some time. The court recognized the effect of a lengthy sentence on her children, but noted that other family members were available to help out.

After that, the district court addressed Defendant's safety-valve reduction argument as well as her fear of returning to Mexico argument. The court noted that "those who are guilty of sex offenses with minors also do not get the benefit likewise," and that "[t]hose kinds of cases where Congress or the Sentencing Commission has allowed for those is something for them to decide, and to me doesn't really play a factor in a downward variance." As for Defendant's fear of returning to Mexico, the court reiterated that Defendant's presence in the United States is illegal, and the results of Defendant's asylum application were beyond the court's control. The court felt that her fear of retribution back in Mexico because "everyone in Mexico is going to know about it," was "a bit of overstatement." Considering "credibility and corroboration," the "factors that are appropriate . . . to consider in weighing that factor," the court concluded that "a fair sentence in this case falls within the guideline range," and declined to vary downward.

Finally, in deciding upon "an appropriate sentence," the court commented on the "impressive . . . array of equipment" and the "impressive number of documents [Defendant] forged," as well as her own personal identity theft. The court stated it needed to impose a sentence that would "reflect the seriousness of the crime, promote respect for the law," impose "a just punishment," deter Defendant and others, and protect the public from similar crimes. The district

court declined to vary downward and ordered Defendant to serve 30 months imprisonment on Counts 1 to 3, concurrent, and 24 months on Count 4, consecutive.

After announcing the sentence, the court made the *Bostic* inquiry. *See United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004). Defendant's only objection was to the court's denial of a variance, "for all the reasons we set forth during this hearing." When the court then specifically asked, "[i]n that regard, have I addressed all your arguments?" defense counsel assented.

Defendant appeals.

## II.

### A.

On appeal, Defendant claims that her sentence is procedurally unreasonable because the district court failed to address her argument that her efforts to cooperate warranted a downward variance. In both her sentencing memorandum and during the sentencing hearing, Defendant claimed that she tried to cooperate with the government, that the government used her information to obtain warrants to raid Corso's, and that numerous news outlets connected her to the raids.

A sentence may be deemed procedurally unreasonable if the court fails to explain why it rejected a non-frivolous request for a different sentence. *United States v. Petrus*, 588 F.3d 347, 352 (6th Cir. 2009); *see also Gall v. United States*, 552 U.S. 38, 51 (2007) ("failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range," is procedural error). We generally review a procedural challenge under an abuse-of-discretion standard. *See id*. at 46. However, despite two opportunities, Defendant did not inform the district court that it had failed to address her argument that her cooperation warranted a downward variance. As a result, she forfeited the argument. Therefore, the standard of review is plain error. *Bostic*; 371 F. 3d at 872–73; *see also United States v. Vonner*, 516 F.3d 382, 386 (6th

Cir. 2008) (en banc).  Plain error is (1) error, (2) that is plain, (3) that affected substantial rights, and (4) that affected the integrity and fairness of the proceedings.  *Vonner*, 516 F.3d at 386.

Defendant's sentence is procedurally reasonable.  Initially, the court acknowledged that news stories had mentioned Defendant by name, but that it lacked control over the media.  Second, the court found that any speculation by others as to her role did not "diminish" her crime.  Thus, it is clear that the district court considered and rejected Defendant's request for a downward variance on the basis of her attempt to cooperate.  These statements alone satisfy the district court's duty to render a procedurally reasonable sentence.  *See United States v. Madden*, 515 F.3d 601, 612 (6th Cir. 2008).  Later, the district court revisited the issue, stating, "I have considered the arguments made by defense counsel in its sentencing memorandum and here again today, that perhaps I ought to vary downward."  The court then reviewed each specific argument—including sentencing disparities, family circumstances, fear of returning to Mexico, cooperation, the risk of retaliation, and her ineligibility for a safety-valve reduction.[1]  Pointedly, the district court noted that the safety valve did not apply here because "Congress or the Sentencing Commission has allowed for those" only in drug cases.  *See generally United States v. Scruggs*, 436 F. App'x 617, 619 (6th Cir. 2011).

In short, the record clearly demonstrates that the district court considered the argument and provided a reasoned basis for the sentence imposed.  There was no procedural error.

**B.**

Defendant also claims that her sentence is substantively unreasonable because the district court "downplayed every consideration given" to her history and characteristics.  *See*  18 U.S.C.

---

[1] Defendant claims that "[t]he sealed portion of the sentencing transcript bears no conclusion or analysis by the court of [Defendant's] argument in this regard."  However, the content of the sealed portion of the sentencing transcript is immaterial because the district court addressed the argument at issue during the unsealed portion of the sentencing hearing, as explained above.

§ 3553(a)(1). That is, the court should have been more lenient given Defendant's lack of prior criminal history, cooperation with the government, and remorse. Again, the record belies Defendant's assertion. Before imposing sentence, the court weighed the nature and circumstances of the offense, Defendant's personal history and characteristics, and the § 3553(a) factors. The court emphasized the need to protect the public and deter others. As the district court pointed out, this was a serious offense, of "impressive" proportions; a sophisticated identification manufacturing operation using molded plastic cards, multi-colored ink, and holographic overlays that resulted in the production of over 1,000 false identification documents. And Defendant continued to operate the illicit business after her husband's departure.

A substantive unreasonableness argument is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *United States v. Rayyan*, 885 F. 3d 436, (6th Cir. 2018). Contrary to Defendant's claims, the district court considered her personal history and characteristics in detail. The district court fulfilled its duty to consider all the relevant factors under § 3553(a) and the advisory Sentencing Guidelines, and it carefully explained the within- Guidelines sentence it imposed. Because the court sufficiently explained why it imposed a within-Guidelines sentence under the § 3553(a) factors, no further explanation of why it declined to impose an alternative sentence based on Defendant's personal history and characteristics was required. *See United States v. Gale*, 468 F.3d 929, 940-41 (6th Cir. 2006).

**III.**

The district court's granular application of the § 3553(a) factors during sentencing easily assures us of the procedural and substantive reasonableness of the sentence imposed. **AFFIRMED.**